**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 25-10525
Non-Argument Calendar
_____

JOSIAH ANTHONY HADLEY,

*Petitioner-Appellant,*

*versus*

SECRETARY, DEPARTMENT OF CORRECTIONS,

*Respondent-Appellee.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:23-cv-01322-RBD-RMN
_____

Before ROSENBAUM, GRANT, and TJOFLAT, Circuit Judges.

PER CURIAM:

A Florida jury convicted Josiah Anthony Hadley of the second degree murder of G.M., a woman with whom he was romantically involved. Hadley appealed his conviction to Florida's Fifth

District Court of Appeal, where he argued, among other things, that the trial court erred by admitting as evidence certain statements obtained in violation of his *Miranda*[1] rights. That court affirmed without written opinion.

After exhausting his postconviction remedies in state court, Hadley filed a 28 U.S.C. § 2254 habeas petition in federal court, raising three claims. The District Court denied all three. We granted a certificate of appealability as to claim one, namely, whether "the state court's denial of [Hadley]'s motion to suppress statements in violation of *Miranda* resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court."

We affirm.

## I. BACKGROUND

### A. The Murder of G.M.

In 2014, Hadley was living in a three-bedroom apartment with G.M. and two friends, David Sanon and Raul Gil. Hadley and G.M shared the primary bedroom in the apartment, although their relationship was "on and off" and they were not "official[ly]" dating at the time. On the night of October 3, 2014, all four roommates were in the apartment, along with several friends. As the night progressed, more people showed up, and they decided to go to a club

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

downtown. Hadley and G.M. drove together, while Sanon rode with two friends, Miguel and Luis.

After everyone arrived at the club, an intoxicated female patron smacked Luis' hat off of his head, which prompted him to "smack her back in the face." A broader altercation ensued, and Luis was arrested. According to Sanon, "that's when [G.M.] and [Hadley] started to argue." Sanon testified that Hadley "was yelling at her" and "called her a bitch."

Around 1:00 a.m., the roommates and their friends decided to return to the apartment. This time, Sanon rode with Hadley and G.M., who continued to argue. At one point, G.M. had to get out of the car to sit on a bench and cry. Once back at the apartment, the group socialized for about an hour until the friends left and only the four roommates remained.

Again, Hadley and G.M. began to argue, so Sanon returned to his room. Just a few minutes later, Sanon heard a "scuffle" coming from Hadley and G.M.'s room, followed by "hitting noises" and "a lot of thump[ing] sounds." Sanon ran to the scene, where he saw Hadley "on top of [G.M.], hitting her." Sanon intervened to restrain Hadley, and Hadley continued trying to hit G.M. Once Hadley had been fully restrained, Sanon turned his attention to G.M., finding her unresponsive and not breathing. After a failed attempt to "wake her up," Sanon and Hadley placed G.M's body in the back seat of Hadley's car and drove her to the hospital.

When they arrived, Joel Hernandez, a registration specialist at the hospital, helped to bring G.M. into the emergency room.

Hernandez testified that Hadley seemed "pretty upset" and "was pacing around." When Hernandez asked Hadley what happened, Hadley said that "he got into an argument with [G.M.] over his baby mama," left the room, and "when he came back, he found [G.M.] outside basically unresponsive."

Hadley gave a different explanation to Nurse Amanda Brewer. She testified that Hadley told her "they had both been drinking and she pushed him, he pushed her back, and then he . . . left to cool off." A few minutes after speaking with Brewer, a hospital security agent witnessed Hadley's vehicle erratically exit the parking lot. Brewer contacted law enforcement, who, in turn, put out a call for Hadley's car.

G.M. was pronounced dead that day, and the cause of death was determined to be "brain and eye hemorrhages due to blunt force head injuries . . . of [the] face and neck."

### B. Police Interrogations

Hadley spoke with police officers on three separate occasions about the incident; twice on October 4, and once on October 8. Statements from each interview were later admitted at trial.

### 1. The Citgo Interview

Officer Jorge Negron observed Hadley's vehicle at approximately 6:00 a.m. on the morning of October 4, 2014, not long after Hadley had fled the hospital. Negron stopped Hadley's vehicle at a nearby Citgo gas station, directed Hadley to exit, and placed him

in handcuffs. Neither Negron nor Hadley could recall whether Negron had his weapon drawn, but Hadley testified that he noticed Negron "putting his gun back in his holster" as he was being arrested. Negron placed Hadley in the back seat of his patrol vehicle for approximately five minutes, at which point supervising Officer Andres Nunez arrived. Negron removed the cuffs and departed.

Detective Lewis Jones then arrived on the scene. When Detective Jones approached the vehicle, Hadley was uncuffed and in the trunk of his own vehicle. Detective Jones began an audio recording. After a brief introduction, he asked Hadley "why don't you tell me what happened tonight?" Detective Jones did not read Hadley his *Miranda* rights. With little to no hesitation, Hadley provided a detailed account of his night, including the group's heavy drinking at the apartment, the altercation at the club, and the drive home.

Hadley told Detective Jones that, once he and G.M. returned home, an argument broke out because Hadley said he wanted to move out of the apartment. Then, Hadley explained, G.M. began swinging at him, successfully striking him in the head at least once. In response, Hadley told Detective Jones that he hit G.M. in self-defense,[2] although he could not recall how many times he hit her. At this point, Hadley said that G.M. was "knocked out cold" from

---

[2] Hadley also said that G.M. had something in her hand that could have been used as a weapon.

6                    Opinion of the Court                    25-10525

"all the drinking and all the fighting" but that he could hear her breathing and felt a pulse.

Concluding the forty-minute encounter, Detective Jones swore Hadley to his testimony, and explained that Hadley's vehicle would need to be towed to "secure it for a search warrant." Another officer escorted Hadley home, where a crime scene technician took photos of the apartment and confiscated the clothes Hadley wore on the night of the murder.

### 2. The October 4 Police Station Interview

At approximately 4:00 p.m. that evening, Detective Jones visited Hadley's parents' house. Hadley was present at the time. Detective Jones asked Hadley if he would go to the police department for further questioning, and Hadley agreed. Some thirty minutes later, Hadley and his father, Gerry Hadley arrived at the department. There, Detective Jones and Detective Ken Shedrick interviewed Hadley with Hadley's father present.[3] Hadley was not read his *Miranda* rights. When the interview concluded, he exited with his father.

### 3. The October 8 Police Station Interview

A final interview with Hadley took place four days later, on October 8 at the police station. Hadley had returned to the police station that day with his father to pick up his phone and his car. Once Hadley arrived, Detective Shedrick asked him to sit down for

---

[3] His father was present for most of the interview, although he was initially placed in a separate room "for a very short time."

some more questions, and Hadley did so freely. Hadley was not initially handcuffed, and the full interview was recorded.

Detective Shedrick began the interview by thanking Hadley for his willingness to speak to him and explaining that Hadley seemed to really care about G.M. Detective Shedrick then stated that he wanted to "go over certain things" about the night in question. Hadley responded: "I don't mind talking to you at all about anything, but I would like my lawyer to be present." Detective Shedrick asked if Hadley had his lawyer's phone number, and Hadley said that his father had the number.

Detective Shedrick left the room for approximately one and one half minutes. When he returned, he told Hadley that he was being arrested for second degree murder and that Hadley was no longer free to leave. Detective Shedrick read Hadley his *Miranda* rights and asked Hadley if he was willing to talk without a lawyer present. Hadley took a lengthy pause. The following interaction ensued:

> **Hadley:** What does [it] mean . . . if I don't . . . decide to talk to you about anything right now without my lawyer? Is my lawyer still going to come here, or?

> **Detective Shedrick:** Your lawyer won't be coming here. Because after this—after we're done right here—you're going to be sent off to the Brevard County Jail. But, you know, I'm trying to get your side of the story. I am. You know, you did ask for a lawyer earlier. I have placed you under arrest since then. Ok. I read you your rights. Now it's your

choice—this is your choice. You do what you think is best for you. . . . Because I've got part of the story. I want everything.

**Hadley:** Ok. I'm willing to talk to you.

The interview that followed was just shy of two hours. Therein, Hadley admitted to a physical altercation with G.M. but said that he acted in self-defense. He made several statements that were both inconsistent with his earlier explanations and inconsistent with physical evidence that would later be presented to the jury.

### C. Trial & Procedural Background

In advance of trial, Hadley filed a motion to suppress all statements made by him to the police on October 4, 2014, and October 8, 2014. The trial court held lengthy hearings on the motion.[4] Throughout the hearings, Judge Charles J. Roberts was openly skeptical of the investigative techniques employed by the officers, noting that the behavior was "frankly . . . troubling to a judge." He was especially cynical of Detective Shedrick's decision to reinitiate questioning after Hadley invoked his right to counsel on October 8, explaining: "I've got to tell you, my first gut reaction is when somebody says, I want to see my lawyer, stop talking . . . [and] get them their lawyer."

---

[4] Hearings on the motion to suppress were held on September 24, 2015, October 30, 2015, and December 12, 2015.

Nonetheless, after a thorough review of the video footage, testimony, and the caselaw, Judge Roberts denied Hadley's motion to suppress in full. He concluded that Hadley was not "in custody," as the Supreme Court has defined that term, until Hadley was formally arrested during the October 8 interview. Therefore, Hadley's *Miranda* protections did not attach until that point. Judge Roberts further explained that, after he was arrested, Hadley was read his rights and provided a "knowing and intelligent" waiver thereof.

Hadley proceeded to trial and was convicted of second degree murder by a jury of his peers. He appealed his conviction arguing, among other things, that the trial court erred by denying his motion to suppress. Florida's Fifth District Court of Appeal affirmed without written opinion. Hadley also applied for state court habeas relief, which was denied, appealed, and affirmed without written opinion.

Finally, Hadley filed a federal habeas petition under 28 U.S.C. § 2254 raising three claims for relief. The District Court denied his petition in full. Hadley petitioned this Court for a certificate of appealability as to his first claim only: whether the state court's denial of his motion to suppress was an incorrect or unreasonable application of clearly established federal law. We granted Hadley's petition.

## II. STANDARD OF REVIEW

As a technical matter, our standard of review for a denied § 2254 petition is de novo. *Reed v. Sec'y, Fla. Dep't of Corrs.*, 593 F.3d

1217, 1239 (11th Cir. 2010). But the underlying legal standard applied by the district court, which we also must follow, is "highly deferential" because Congress "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted).

Specifically, § 2254 dictates:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Thus, on appeal, "we review de novo the district court's decision about whether the state court acted contrary to clearly established federal law, unreasonably applied federal law, or made an

25-10525                Opinion of the Court                11

unreasonable determination of fact."[5] *Reed*, 593 F.3d at 1239 (quoting *Smith v. Sec'y, Dep't of Corrs.*, 572 F.3d 1327, 1332 (11th Cir. 2009)). And we may affirm the denial of habeas relief on any ground supported by the record. *Moody v. Holman*, 887 F.3d 1281, 1292 (11th Cir. 2018).

### III. Discussion

This appeal concerns Hadley's Fifth Amendment privilege against self-incrimination.[6] The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

In *Miranda*, the Supreme Court explained that interrogations made while in police custody impose "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so

---

[5] "Under § 2254, we must evaluate the highest state-court decision that evaluated the claim 'on the merits.'" *Marshall v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1277, 1285 (11th Cir. 2016). Here, that is the affirmance from Florida's Fifth District Court of Appeal. But because that court issued a summary affirmance without written opinion, we must "'look through' the unexplained decision to the last state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 584 U.S. 122, 125, 138 S. Ct. 1188, 1198 (2018). Thus, we review Judge Roberts' verbal pronouncement of his rationale denying Hadley's motion to dismiss. We must presume that the Fifth District Court of Appeal adopted this same reasoning unless the Department of Corrections shows that the affirmance likely rested on different grounds. *See id.*

[6] The Fifth Amendment privilege against self-incrimination is incorporated against the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 3, 84 S. Ct. 1489, 1491 (1964).

freely." 384 U.S. at 467, 86 S. Ct. at 1624. Building on that premise, the Court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subject to questioning[,] . . . [p]rocedural safeguards must be employed to protect the privilege" against self-incrimination. *Id.* at 478–79, 86 S. Ct. at 1630.

Those procedural safeguards, the Court specified, require an officer to inform a defendant "prior to any questioning": (1) "that he has the right to remain silent"; (2) "that anything he says can be used against him in a court of law"; (3) "that he has the right to the presence of an attorney"; and (4) "that if he cannot afford an attorney one will be appointed for him prior to any questioning." *Id.* at 479, 86 S. Ct. at 1630. Only after these rights are read to a defendant and after he "knowingly and intelligently waive[s]" them, can the police interrogate the defendant. *Id.* Finally, to effectuate its holding, the Court wrote that "unless and until such warnings and waiver are demonstrated by the prosecution at trial, *no evidence obtained as a result of interrogation can be used against [a defendant]." Id.* (emphasis added).

The bounds of *Miranda* and its exclusionary rule have been extensively interpreted by subsequent Supreme Court cases and by the Courts of Appeals. We now apply that binding precedent to the facts at hand. In so doing, we conclude that, while the District Court erroneously held that Hadley's petition was foreclosed by the Supreme Court's opinion in *Stone v. Powell*, it correctly ruled on

alternative grounds that the Florida state courts did not unreasonably apply federal law.

### A. *The District Court Misapplied* Stone v. Powell

As discussed, Hadley's first claim for federal habeas relief ("Claim One") was that "the state court's denial of [his] motion to suppress statements obtained in violation of *Miranda* resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court." The District Court gave two alternative reasons for dismissing this claim. Its first reason was erroneous. The Court wrote:

> The Supreme Court in *Stone v. Powell*, 428 U.S. 465 (1976), determined that "when the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494 (footnotes omitted). . . . [Hadley] does not allege he was not provided a full and fair litigation of this claim in either the trial court or appellate court. As such, he has failed to present a cognizable claim on federal habeas review as to Claim One.

The Court also wrote in a footnote that Hadley "cannot evade the bar of *Stone v. Powell* by casting his challenge to the search and seizure as a due process claim rather than a Fourth Amend-

ment claim." But even a cursory review of Hadley's Claim One reveals that it was a Fifth Amendment claim about his *statements* that were not suppressed. It was not a Fourth Amendment claim; the words "search" and "seizure" do not appear even once in Hadley's petition.

This error matters because the Supreme Court expressly declined to extend *Stone*'s reasoning beyond the Fourth Amendment context. In *Withrow v. Williams*, the Court held that "*Stone*'s restriction on the exercise of federal habeas jurisdiction does not extend to a state prisoner's claim that his conviction rests on statements obtained in violation of the safeguards mandated by *Miranda*[.]" 507 U.S. 680, 683, 113 S. Ct. 1745, 1748 (1993). Both parties on appeal agree that the District Court erred. So, without need for further discussion, we agree and move on to the District Court's alternative holding.

## B. The State Court's Application of Miranda Was Not Unreasonable

After ruling that *Stone* precluded Hadley's Claim One, the District Court proceeded to state the following:

> Further . . . [u]pon thorough review of the record and the applicable law, the Court finds that the state court's decision was neither contrary to, nor an unreasonable application of clearly established federal law. Moreover, it was not based on an unreasonable determination of the facts given the evidence presented to the state court. *See* 28 U.S.C. § 2254(d). Claim One will be denied.

Because we may affirm on any ground addressed by the lower court, and indeed, any ground supported by the record, *see Moody*, 887 F.3d at 1192, we now conduct a de novo review of this alternative holding. In so doing, we reach the same conclusion as the District Court: The Florida trial court did not unreasonably apply clearly established federal law in denying Hadley's motion to suppress his statements made on October 4, 2014, and October 8, 2014.

### 1. Statements of October 4, 2014

Hadley argues that his *Miranda* rights were violated during the October 4 Citgo gas station interview because he was interrogated without being informed of his right to remain silent and to speak with an attorney. He argues, as he must, that he was entitled to be informed of these rights because the interrogation took place while he was "in custody"—a threshold status required for *Miranda* protections to take effect.

After a full hearing, the Florida trial court determined that Hadley was not in custody during the Citgo interrogation. Judge Roberts explained his ruling as follows:

> The police did initially exercise control over Mr. Hadley. And there are a lot of cases that say when that happens, if it persists, then . . . he should be read *Miranda* before he makes any statements.
>
> However, in this particular case there were some initial commands to Mr. Hadley, with which he complied. Those commands are in the nature of officer's

safety and gain initial control, and temporary detainment of the Defendant to make sure that he doesn't have a weapon, or that he's going to be cooperative, and to conduct some investigation. The Defendant was then taken out of cuffs. The detention was very temporary. He was taken out of cuffs. He was allowed to move about freely. He was allowed to exercise control over his car again. He was told he was not in custody.

And under the totality of the circumstances, a reasonable person would believe that they were not in custody. He was asked some initial questions, and there was a recording of it, in the nature of investigation as to what had occurred. And he voluntarily complied. And he was not entitled to *Miranda* at that time.

This was not an unreasonable conclusion. A "custodial" interrogation necessitates either a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983) (internal quotation marks omitted). We look at the "totality of the circumstances," assessing whether an objectively reasonable person in the defendant's position would have felt a restraint on his freedom of movement to such an extent that he would not have felt free to leave. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). Relevant factors include: (1) the location of questioning; (2) the duration of questioning; (3) statements made during the interview; (4) the presence or absence of physical restraints during the questioning; and (5) whether the suspect was released at the

end. *Howe v. Fields*, 565 U.S. 499, 508–09, 132 S. Ct. 1181, 1189 (2012). "Under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." *Brown*, 441 F.4th at 1347 (alterations adopted) (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).

Here, Hadley argues that he was placed in custody when he was handcuffed, ordered out of his vehicle, and told to walk slowly backwards. He contends that, although he was uncuffed for the interview with Detective Jones, he remained in custody because of the heavy police presence and implicit restraint on his movement. He also notes that he had to seek permission to turn his car off during the interview and was told his car would be impounded. Notably, Hadley testified the he did not feel free to leave and Detective Jones *also testified that Hadley was not free to leave*.

Whether Hadley was in custody during the Detective Jones interview is admittedly a close call. Although we have stated that "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant," *see id.* (quoting *Moya*, 74 F.3d at 1119), it is nonetheless suggestive that both the detective and the suspect agreed that the suspect was not free to leave. After being initially handcuffed (potentially at gunpoint), Hadley was turned over to several officers until the interview with Detective Jones began. It is quite conceivable that a reasonable person under the circumstances would have felt no opportunity to walk or drive away from the officers.

That being said, habeas relief under § 2254 imposes a demanding standard. "We cannot grant relief . . . by conducting our own independent inquiry into whether the state court was correct as a de novo matter." *Yarborough v. Alvarado*, 541 U.S. 652, 665, 124 S. Ct. 2140, 2150 (2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Id.* (internal quotation marks omitted).

Ultimately, the Florida trial court's ruling was a reasonable application of *Miranda* and its progeny, even if it was not the only reasonable application. *See Jenkins v. Comm'r, Ala. Dep't of Corrs.*, 963 F.3d 1248, 1263 (11th Cir. 2020) ("A state court's decision is reasonable 'so long as fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). Hadley was not handcuffed during the interview, he was never told that he was under arrest, and he never asked to leave, so he was never expressly told whether or not he was free to do so. There is no clearly established Supreme Court precedent instructing that Hadley was in custody under these circumstances. Therefore, we are bound to affirm.

Hadley also moved to suppress his statements made during the October 4 police station interview. However, he later conceded to the trial court that he was not in custody, and he made no argument to the contrary in seeking federal habeas relief. Thus, we proceed to October 8.

### 2. Statements of October 8, 2014

Hadley argues that his statements made during the October 8 police station interview should have been suppressed because the police failed to respect Hadley's invocation of his right to counsel. This question, too, turns on whether Hadley was in custody—specifically whether he was in custody at the moment he invoked his right to counsel. Because although it is enshrined in Supreme Court precedent that the police cannot "at their instance . . . reinterrogate an accused in custody if he has clearly asserted his right to counsel", *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S. Ct. 1880, 1885 (1981), the Court has "never held that a person can invoke his *Miranda* rights anticipatorily" or in a context other than 'custodial interrogation.'" *McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3, 111 S. Ct. 2204, 2211 n.3 (1991).

The trial court found that Hadley was not in custody when he asserted his right to a lawyer. Judge Roberts explained:

> He was not in custody until . . . Detective Shedrick advised him he was in custody, or put him under arrest, exercised control over him, handcuffed him. Prior to that time, he very clearly, if you go through the case law, all the factors that are attended with that, he had come there voluntarily with his father. He was not coerced. He was, there were no threats. Nobody employed loud language or harsh language, or exercised any control over him. He indicated that he was there voluntarily. . . .

> So he wasn't in custody until he was informed he was arrested. At that time, the detective did what the law requires, informed him of his rights. And Mr. Hadley, after being informed of his rights and reflecting on the matter, waived his right to have counsel present, and freely and voluntarily, without coercion, knowingly and intelligently, waived his right . . . to have counsel present before he talked.

We agree. Hadley arrived at the police station voluntarily on October 8 to retrieve his belongings. Once there, Hadley willingly accepted Detective Shedrick's invitation to migrate to the interview room. Detective Shedrick then engaged in small talk and asked Hadley to "go over some things" about the night in question. It was at this moment when Hadley asked for his lawyer. And it was plainly reasonable to determine he was not yet in custody.

To be sure, Hadley was arrested no more than three minutes later. And our Court has held that *Miranda* rights may be invoked either "during custodial interrogation *or when interrogation is imminent.*" *United States v. Grimes*, 142 F.3d 1343, 1348 (11th Cir. 1998). But we have not elaborated on what it means for an interrogation to "be imminent." Moreover, the Supreme Court has not addressed such a situation, nor has it held that *Miranda* protections can ever be invoked outside of a strict custody status. *See McNeil v. Wisconsin*, 501 U.S. at 182 n.3, 111 S. Ct. at 2211 n.3. Therefore, we cannot say that Hadley's pre-custody invocation of his right to counsel—as a matter of clearly established federal law determined

25-10525                Opinion of the Court                21

by the Supreme Court—meant that Detective Shedrick had to stop the interview. *See* 28 U.S.C. § 2244.[7]

### IV. CONCLUSION

For the foregoing reasons, the District Court's denial of habeas relief is affirmed.

**AFFIRMED.**

---

[7] Hadley makes no argument about his subsequent *Miranda* waiver being involuntary, so we need not address that issue.